UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
HOME LIFE HEALTH CARE, LLC et al.,

                Plaintiffs,

   v.

IAN DORFMAN, et al.,

                Defendants.
----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
25-CV-0526-SJB-ST

**BULSARA, United States District Judge:**

      Plaintiffs Home Life Health Care, LLC and HLHC, LLC, d/b/a Alvita Care (collectively, "Alvita") commenced this action against Ian Dorfman and Elder Care Homecare ("Elder Care"), for violating the terms of Dorfman's employment agreement by allegedly taking confidential information and soliciting employees and clients on Elder Care's behalf. (Compl. dated Jan. 30, 2025 ("Compl."), Dkt. No. 1 at 31). Alvita and Elder Care, as their names suggest, are in the business of providing home health care service for patients with Alzheimer's and other similar conditions.

      Three months after starting the case, Alvita filed an Amended Complaint that added claims against Defendant Chris Tatar for violations of a similar employment agreement. (Am. Compl. dated May 8, 2025 ("Am. Compl."), Dkt. No. 26 at 35). Alvita had previously filed two motions for preliminary injunctions that were denied. (*See* Order dated Apr. 15, 2025; Order dated June 5, 2025). Now pending before the Court is Alvita's third such motion seeking relief against Dorfman, Tatar, and Elder Care

(collectively, "Defendants").  (Pls.' Mot. for Prelim. Inj. dated Aug. 2, 2025 ("Pls.' Third PI Mot."), Dkt. No. 50).  For the reasons stated below, Alvita's third motion is denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following alleged facts are taken from Alvita's Amended Complaint.  Alvita provides home health care services in the New York area.  (Am. Compl. ¶ 18).  Elder Care is an industry competitor of Alvita's.  (*Id.* ¶ 1).  Dorfman and Tatar were previously employed by Alvita, and now both work for Elder Care.  (*Id.* ¶¶ 2–3, 6–7).  Alvita hired Dorfman on September 13, 2021.  (*Id.* ¶ 33).  By January 2023, Dorfman was the Vice President of Strategic Partnerships at Alvita, where he negotiated contracts with Alvita's referral sources, developed and maintained relationships with those sources and other entities on Alvita's behalf, and supported Alvita's sales team.  (*Id.* ¶ 35).  Dorfman resigned from Alvita on January 3, 2025.  (*Id.* ¶ 6).  Alvita alleges that Dorfman accepted an offer of employment from Elder Care on December 10, 2024, (Am. Compl. ¶ 66), and began working for it on January 6, 2025.  (*Id.* ¶ 81).

Alvita hired Tatar on June 15, 2023.  (*Id.* ¶ 45).  He worked as a Client Care Liaison, and he also developed and maintained "relationships with referral sources and entities in the community," advised, sold, and onboarded "clients for home care services," and negotiated contracts with the referral sources.  (*Id.* ¶ 47).  Tatar left Alvita on March 14, 2025, (*id.* ¶ 96), and joined Elder Care on March 17, 2025.  (*Id.* ¶ 7).

Upon their hiring at Alvita, both Dorfman and Tatar signed employment contracts (the "Agreements").  (Am. Compl. ¶¶ 58, 59).  Those Agreements contained

2

three relevant prohibitions related to 1) confidentiality, 2) non-solicitation, and 3) return of property.

The Confidentiality Clause prohibits the use or disclosure of "Confidential Information," defined as:

> information relating to Alvita's products or services, processing, marketing, selling, client lists, patient names, referral sources (including employee names and contacts at such referral sources), trade secrets, call lists, client data, manuals, policies, memoranda, notes, records, technical data, research and development data, sources of supply and material, operating and cost data, and financial information. "Confidential Information" also includes proprietary and/or confidential information of Alvita's clients, referral sources and trading partners (if any), including client's financial information and patient's health and medical information, which is protected by HIPAA[.]

(*Id.* ¶ 60(b)).  The Confidentiality Clause is in effect "for so long as the information is not generally known to the public."  (*Id.* ¶ 60(c)).

The Non-Solicitation Clause prohibits employees, while at Alvita and for one year following termination of employment, from employing or soliciting for employment "any person who is then, and was at any time during Employee's employment, an employee, sales representative or agent of Alvita." (*Id.* ¶ 61(a)).  It also prohibits employees for the same period from soliciting:

> any of Alvita's clients (including, but not limited to, patients, patients' families, patients' representatives, hospitals, assisted living facilities and nursing homes) or referral sources (including, but not limited to, hospitals, nursing homes, assisted living facilities, rehabilitation facilities, physicians, community centers and religious organizations) with which Employee had contact while working for Alvita, or about which Employee learned Confidential Information (the "Restricted Entities"); nor will Employee in any way, directly or indirectly, on Employee's own behalf or on behalf of any other person, firm, corporation or entity, divert the business of, or take away, any Restricted Entities, or otherwise interfere with, disrupt or

3

attempt to disrupt relations between Alvita and any of the Restricted Entities.

(*Id.* ¶ 61(b)).  The Agreements also contain a Return of Property Clause that required ex-employees to return all Alvita property in their possession, including Confidential Information.  (*Id.* ¶ 62).

Alvita alleges that in the weeks between his offer of employment from Elder Care and his resignation from Alvita, Dorfman copied numerous documents onto a personal flash drive and Google Drive, and forwarded Confidential Information, including names of all of the referral sources, sales leads associated with those sources, and clients with whom he had contact within the prior year, among other items, to his personal email account.  (*E.g.*, Am. Compl. ¶¶ 67, 71, 73, 74, 76).  He also set up meetings with Alvita referral sources using his personal Gmail account, while still employed by Alvita, on Elder Care's behalf.  (*Id.* ¶¶ 70–71).  As of the filing of the Amended Complaint, none of this property had been returned.  (*Id.* ¶ 94).[1]

Besides sharing this information with Elder Care, (*id.* ¶ 75), Alvita also alleges that Dorfman has used this information to divert business and solicit employees away from Alvita to join Elder Care.  (*Id.* ¶ 83).  For instance, Alvita claims that on January 16, 2025, an Alvita employee "observed Dorfman with another Elder Care representative visiting Belair Nursing and Rehab, a Restricted Entity . . . [where he had] at least one referral source with which he had contact in the weeks leading up to his departure." (*Id.* ¶ 92).  Alvita also claims that Dorfman "conspired with . . . Elder Care, to solicit and

---

[1] At the hearing, the parties were, and still remain, in vigorous dispute about what was returned to Alvita and what is outstanding.

4

recruit Tatar." (Am. Compl. ¶ 7). Alvita alleges that Elder Care knew of the Agreements, and "substantially assisted, benefitted from, and was complicit in Dorfman's unlawful conduct." (*Id.* ¶ 112).

With respect to Tatar, Alvita alleges that Tatar has used the Confidential Information taken by Dorfman, (*id.* ¶ 114), and that he has also violated the Agreements by seeking business from "Thrive Senior Living at Montvale, which was an account that Dorfman and Tatar jointly signed into contract with Alvita in late November 2024." (*Id.* ¶ 117).

Alvita's claims are for: 1) a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, against all Defendants, (Am. Compl. ¶¶ 103–20); 2) breach of contract against Dorfman and Tatar (*id.* ¶¶ 121–26); 3) misappropriation of trade secrets against all Defendants, (*id.* ¶¶ 127–42); 4) tortious interference with contracts against Elder Care, (*id.* ¶¶ 143–54); 5) conversion against all Defendants, (*id.* ¶¶ 155–67); 6) breach of fiduciary duty and/or duty of loyalty against Dorfman, (*id.* ¶¶ 168–76); 7) civil conspiracy to commit tortious interference with contract against all Defendants, (Am. Compl. ¶¶ 177–95); 8) unfair competition against all Defendants, (*id.* ¶¶ 196–208); and 9) a request for permanent injunctive relief against all Defendants, (*id.* ¶¶ 209–20).

Alvita filed its first Complaint on January 30, 2025. (Compl. at 31). Defendants filed a letter requesting a premotion conference ("PMC") in anticipation of a motion to dismiss. (Letter Mot. for PMC dated Mar. 31, 2025, Dkt. No. 14 at 1). Alvita filed its first motion for both a preliminary injunction and temporary restraining order ("TRO") the next day, on April 1, 2025, two months after filing the Complaint. (First Mot. for

5

Prelim. Inj. & TRO dated Apr. 1, 2025 ("Pls.' First PI/TRO Mot."), Dkt. No. 18 at 6). The Court denied the TRO motion but set a hearing date for the preliminary injunction motion for May 8, 2025. (Order dated Apr. 2, 2025). Less than a week later, Alvita filed a letter that opposed the request for PMC and informed the Court of its intent to file an amended complaint. (Pls.' Opp'n to Defs.' Mot. for PMC dated Apr. 7, 2025, Dkt. No. 21 at 1). In light of Alvita's intent to amend, Defendants requested adjournment of the preliminary injunction hearing, (Defs.' Letter Mot. to Adjourn Conf. dated Apr. 8, 2025, Dkt. No. 22), to which Alvita consented. (Pls.' Resp. to Mot. to Adjourn Conf. dated Apr. 14, 2025, Dkt. No. 24). Alvita indicated it would renew its motion for preliminary injunction within 30 days following the filing of any amended complaint. (*Id.*).

Given the anticipated amended complaint and consent to adjournment, the Court denied the first motion for a preliminary injunction without prejudice to renewal and adjourned the May 8, 2025 hearing. (Order dated Apr. 15, 2025). Alvita missed the deadline by which to file an amended complaint as of right set by Federal Rule of Civil Procedure 15,[2] and the Court directed it to file any amended complaint by May 8, 2025. (Order dated Apr. 24, 2025). Alvita filed Amended Complaints on May 8 and May 13, 2025, though both are dated May 8, 2025.[3] (Am. Compl. dated May 8, 2025 ("Am.

---

[2] "A party may amend its pleading once as a matter of course no later than . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b) . . . whichever is earlier." Fed. R. Civ. P. 15(a)(1)(B).

[3] The only apparent difference between the filings is that the latter filed Amended Complaint includes an attachment showing in redline the changes from the original Complaint. The Court relies on the text of the Amended Complaint filed on the deadline set by Court Order.

6

Compl."), Dkt. No. 26 at 35; Am. Compl. dated May 8, 2025, Dkt. No. 28 at 35). After Defendants filed a motion to renew their PMC request, the Court directed full briefing on Defendants' anticipated motion to dismiss. (Order dated May 15, 2025).

On June 4, 2025, Alvita filed a request for a TRO and preliminary injunction on the new Amended Complaint, but did so via letter. (Pls.' Letter Mot. for TRO & Prelim. Inj. dated June 4, 2025 ("Pls.' Second PI/TRO Mot."), Dkt. No. 35 at 1). The Court denied this motion, because it failed to comply with the Court's Individual Practices. (Order dated June 5, 2025). Defendants' fully briefed Motion to Dismiss was then filed on the docket on July 10, 2025. (Mot. to Dismiss dated June 5, 2025, Dkt. No. 41).

Alvita did not file the currently pending third motion for a preliminary injunction until August 2, 2025, and did not include a request for a TRO. (Pls.' Third PI Mot.). The Court held a hearing on this third motion on August 19, 2025. Alvita was directed to file any additional argument and evidence it wished the Court to consider by August 26, 2025, and Defendants were directed to file any response by one week thereafter. (Min. Entry & Order dated Aug. 19, 2025). Both parties complied.

## DISCUSSION

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024). To obtain a preliminary injunction, a party must clearly show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly

7

favoring the moving party; and (3) that a preliminary injunction is in the public interest." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).  A party must persuade the court that these elements have been satisfied through a "clear showing," in order to obtain "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotations and citations omitted).

Preliminary injunctions may be "mandatory" or "prohibitory." *N. Am. Soccer League*, 883 F.3d at 36.  "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* at 36–37 (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).  The status quo in the context of a preliminary injunction is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (*per curiam*) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994)).  A party moving for a mandatory injunction, or an injunction that "will provide the movant with substantially all the relief sought," which "cannot be undone even if the defendant prevails at a trial on the merits" must satisfy a heightened legal standard. *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (quotations and citation omitted).  The movant must both "(1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits," *id.* (quotations and citations omitted), as opposed to merely establishing irreparable harm and either a likelihood of

8

success or both a serious question as to the merits and decidedly prevailing on the balance of hardships. Neither party addressed this standard in their papers.

Here, Alvita seeks to alter the status quo, in part, because it seeks the return of Confidential Information allegedly in Defendants' possession. (Am. Compl. at 35). That relief, however, is a small part of what is being sought. And in another sense, Alvita is simply seeking enforcement of their contract—a contract on which there is much disagreement about whether Defendants have violated it, but little disagreement about its meaning or scope. In other words, this is not a case where a preliminary injunction "will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial." *Tom Doherty*, 60 F.3d at 35. In such a case, "there is no reason to impose a higher standard." *Id.*[4] The Court, therefore, declines to impose the higher legal standard, and only uses the standard for a prohibitory injunction regarding success on the merits, which is "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *State Farm*, 120 F.4th at 79.

"Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d

---

[4] "In 'borderline cases,' essentially identical injunctions 'can be phrased either in mandatory or prohibitory terms.'" *Daileader*, 96 F.4th at 356 (quoting *N. Am. Soccer League*, 883 F.4d at 36 n.4). The Second Circuit has noted that "'breach of contract cases' such as this one can often provoke disputes about the 'status quo.'" *Id.* (quoting *Tom Doherty*, 60 F.3d at 34). That is because "[a] plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires." *Id.* (quoting *Tom Doherty*, 60 F.3d at 34).

9

Cir. 1999) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)); *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023). "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez*, 175 F.3d at 234. Irreparable harm is an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). And a "plaintiff seeking a preliminary injunction must establish that . . . [it] is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. This is a "substantial" burden. *Daileader*, 96 F.4th at 358.

"A district court should generally consider delay in assessing irreparable harm," *Tom Doherty*, 60 F.3d at 39, because a preliminary injunction implies an "urgent need for speedy action to protect the plaintiff['s] rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Delay "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction." *Id.* "There is no bright-line rule for how much delay is too much, but courts in this Circuit 'typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.'" *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 17-CV-8028, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)) (collecting cases); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary

10

injunction."). "[T]he length of delay is measured from the time the plaintiff originally learned of the alleged violation or is put on notice thereof[.]" *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 301 (S.D.N.Y. 2021) (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). Delay "standing alone" may "preclude the granting of preliminary injunctive relief." *Tough Traveler*, 60 F.3d at 968 (quoting *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985)).

Here, the significant delay in bringing the preliminary injunction motion alone precludes the preliminary relief. Alvita was aware of Defendants' alleged violations at least as early as January 8, 2025. On that date, Alvita sent a cease-and-desist letter to both Dorfman and the CEO of Elder Care, which suggested Alvita may seek an injunction and monetary damages, (Letter to David Gilberg dated Jan. 8, 2025, attached as Ex. 3 to Am. Compl., Dkt. No. 26 at 51–54[5]), and raised "the specter of the use of confidential information and solicitation of clients and their employees." (Prelim. Inj. Hr'g Tr. dated Aug. 19, 2025 ("PI Hr'g Tr.") at 7:1–5).

Alvita did not bring its first motion for a preliminary injunction until April 1, 2025—nearly three months after it first learned about the alleged violations. After belatedly filing its amended complaint in early May, Alvita took weeks to file its second motion, a half-hearted attempt done via a single letter, and in plain violation of the Court's Individual Practices. (*See* Order dated June 5, 2025). And then, rather than refiling the motion immediately and in accordance with the relevant rules, Alvita

---

[5] Citation reflects PDF pagination.

11

waited yet *another* two months to file its third preliminary injunction motion. (Pls.' Third PI Mot.). All told, this resulted in a delay of nearly eight months from the time that Alvita first became aware of the alleged violations.[6] Although some delay can be attributed to the procedural posture of the case, the initial three-month wait and the two months between the filing of the second and third motions for a preliminary injunction are unexplained and unjustified.

Alvita did not address the delay in its initial memorandum in support of the third motion, (Pls.' Mem. in Support of Third PI Mot. dated Aug. 2, 2025 ("Pls.' Mem"), Dkt. No. 51). The Court noted during the hearing that delay was grounds for dismissal, and Alvita argued that the procedural posture of the case necessitated the delay. (PI Hr'g Tr. at 5:7–13:14). Yet despite the Court's extensive discussion of delay, Alvita only addressed it in the post-hearing briefing by arguing that it "responded diligently at every juncture." (Suppl. Mem. of Law in Support of Third PI Mot. dated Aug. 26, 2025 ("Pls.' Suppl. Mem."), Dkt. No. 64 at 5). But responding to discovery demands and court orders has nothing to do with expeditiously moving to seek injunctive relief. This is noteworthy given that Defendants argued extensively about delay in both their initial response in opposition, (Defs.' Mem in Opp'n dated Aug. 12, 2025 ("Defs.' Opp'n"), Dkt. No. 58 at 12–14), and in their supplemental brief, (Defs.' Suppl. Mem. in Opp'n dated Sep. 5, 2025 (Defs.' Suppl. Opp'n"), Dkt. No. 74 at 2 n.1).

---

[6] Even if Alvita were to argue that the "clock" should restart when they learned of Tatar's resignation and hiring by Elder Care, that would still result in a delay of over four months from mid-March 2025 to the filing of the third preliminary injunction motion in August 2025.

12

This long delay from knowledge of alleged breaches to properly seeking preliminary injunctive relief demonstrates that any harm is not irreparable. *E.g.*, *supra* at 10–11; *Pet Life, LLC v. KAS Pet, LLC*, 690 F. Supp. 3d 41, 47 (E.D.N.Y. 2023) (denying preliminary injunction because plaintiff waited several months to seek relief); *Monowise Ltd.*, 2018 WL 2089342, at *2 (denying preliminary injunction because plaintiff waited at least five months before filing the motion).[7]

There is a separate and independent problem that dooms the preliminary injunction: the availability of damages as alternative relief. In evaluating irreparable harm, the court must pay "particular attention to whether the 'remedies available at law, such as monetary damages, are adequate to compensate for that injury.'" *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S 388, 391 (2006)). "[I]t is settled law that when an injury is compensable through money damages there is no irreparable harm." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

Damages are the "classic remedy for breach of contract." *Ide v. Brit. Airways PLC*, 529 F. Supp. 3d 73, 87 (S.D.N.Y. 2021) (quoting *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994)). But not all damages can be quantified or measured. If the damages are hard to measure and the plaintiff has

---

[7] Counsel's explanation for the delay at the hearing provided no real justification, just a lengthy reiteration of the procedural history of the case, which only underscored the long delay. (PI Hr'g Tr. at 6:1–23; 8:10-12:14; 13:12-14 ("The problem is, from plaintiffs' perspective, we are many months into this and, for all intents and purposes, nothing has happened.")). As to the supposed obstruction and procedural delay by Defendants, that elides over the significant activities over which Plaintiff had complete control—filing of the motions and amended complaints—but chose not to expedite.

suffered a "loss of reputation, goodwill[,] [or] business opportunities," there may be irreparable harm from the breach of contract. *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *PCS Wireless LLC v. A to Z Wireless Solutions Inc.*, 841 F. Supp. 2d 649, 652 (S.D.N.Y. Jan. 18, 2012) ("Courts generally are reluctant to grant preliminary injunctions in breach of contract actions, unless there are damages that are difficult to measure and there is a risk of loss of goodwill, reputation, or business opportunities." (citing *CRP/Extell Parcel I*, 394 Fed. App'x at 781)).

Alvita has not shown that monetary damages would be insufficient here. Its claims all rest on an underlying alleged breach of contract, for which damages are the appropriate remedy. *Ide*, 529 F. Supp. at 87. The related business tort claims, such as unfair competition and trade secrets, are also remedied by damages. *E.g.*, *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118–19 (2d Cir. 2009) ("Where a misappropriator seeks only to use [trade] secrets—without further dissemination or irreparable impairment of value—in pursuit of profit . . . an award of damages will often provide a complete remedy for such an injury."). For example, the Amended Complaint states that Alvita has "experienced a significant decrease in revenue from [Dorfman's] key referral sources, including Sollis, Park Avenue Synagogue and Goldman Sachs." (Am. Compl. ¶ 44). The classic remedy for such injuries is damages.[8]

---

[8] Tellingly, to that end, Alvita seeks to amend the complaint *yet* again, to expound on monetary damages suffered. (Letter Proposing Joint Br. Schedule dated Sep. 18, 2025, Dkt. No. 76 at 1).

14

Alvita has also not shown a difficulty in quantifying damages; indeed, its papers contain estimates of revenue losses. (*E.g.*, Decl. of Sarah E. Thompson dated Aug. 26, 2025 ("Thompson Decl."), Dkt. No. 68 ¶¶ 12, 13 ("Since the departures of Dorfman and Tatar, Alvita has experienced revenue declines of up to seventy-five percent at several of their former accounts . . . . [the misappropriation and solicitation] have caused and continue to cause irreparable harm to Alvita's goodwill, competitive standing, and revenue pipeline.")).

There is no demonstrable "loss of reputation and customer goodwill," which the complaint alleges in a conclusory fashion. (*E.g.*, Am. Compl. ¶¶ 120, 126, 214). "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *M.V. Music v. V.P. Records Retail Outlet, Inc.*, 653 F. Supp. 3d 31, 39 (E.D.N.Y. 2023) (quoting *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012)); *see also Carson Optical, Inc. v. Alista Corp.*, 800 F. App'x 48, 49 (2d Cir. 2020) (affirming district court's determination that conclusory statements were insufficient to establish loss of goodwill). The evidence of such loss and reputational injury is thin to non-existent. None of declarations submitted by Alvita suggests that a client who chooses to go from one provider to another is irretrievably lost. (*See generally* Thompson Decl.; Decl. of Michael McGee dated Aug. 26, 2025 ("McGee Decl."), Dkt. No. 66; Decl. of Charles Wood dated Aug. 26, 2025 ("Wood Decl."), Dkt. No. 67). Nor does any declarant talk about reputational loss resulting from client or employee

15

defection, in any nonconclusory fashion. (*See generally* Thompson Decl.; McGee Decl.; Wood Decl.).

Indeed, Alvita's CEO couched the "loss of an experienced sales representative" in purely financial terms: "a minimum of twelve to twenty-four months of diminished revenue," which "is exacerbated if an experienced sales representative has moved to a competitor and then leverages the relationships and information from their previous employer to solicit the same referral sources." (McGee Decl. ¶ 9). Alvita's VP of Revenue Operations and VP of Sales stated essentially the same thing. (*See, e.g.*, Wood Decl. ¶¶ 3–4, 12 (quantifying the loss of sales attributable to Dorfman and Tatar's departure)). A temporary reduction in relationships that corresponds to a clearly quantifiable revenue loss—that is apparently elastic, and rebounds within 12–24 months—is not a reputational or good-will loss, but one remedied by damages. *E.g., M.V. Music*, 653 F. Supp. 3d at 40 (denying preliminary injunction because plaintiffs failed to explain how their "reputation and goodwill [were] negatively impacted," and how the "harm they alleged could not ultimately be remedied by damages if they were to prevail on the merits").

Having found that Alvita failed to show irreparable harm—both because there was a long period of delay and damages can fully compensate it—the Court need not reach the other elements required for a preliminary injunction. *See Faiveley Transp. Malmo*, 559 F.3d at 120 ("In the absence of evidentiary support of irreparable harm, there was no basis for the entry of a preliminary injunction[.]").

16

## CONCLUSION

For the reasons explained above, Alvita's motion for a preliminary injunction is denied.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: September 24, 2025
       Central Islip, New York

17